Young, J.
We are presented again with a clash of two bedrock principles of our legal tradition: the sacrosanct right of individuals to dominion over their private property, on the one hand and, on the other, the state’s authority to condemn private property for the commonweal. In this case, Wayne County would use the power of eminent domain to condemn defendants’ real properties for the construction of a 1,300-acre business and technology park. This proposed commercial center is intended to reinvigorate the struggling economy of southeastern Michigan by attracting businesses, particularly those involved in developing new technologies, to the area.
Defendants argue that this exercise of the power of eminent domain is neither authorized by statute nor permitted under article 10 of the 1963 Michigan Constitution, which requires that any condemnation of private property advance a “public use.” Both the Wayne Circuit Court and the Court of Appeals rejected these arguments — compelled, in no small measure, by this Court’s opinion in Poletown Neighborhood Council v Detroit.[1] We granted leave in this case to consider the *451 legality of the proposed condemnations under MCL 213.23 and art 10, § 2 of our 1963 Constitution.
We conclude that, although these condemnations are authorized by MCL 213.23, they do not pass constitutional muster under art 10, § 2 of our 1963 constitution. Section 2 permits the exercise of the power of eminent domain only for a “public use.” In this case, Wayne County intends to transfer the condemned properties to private parties in a manner wholly inconsistent with the common understanding of “public use” at the time our Constitution was ratified. Therefore, we reverse the judgment of the Court of Appeals and remand the case to the Wayne Circuit Court for entry of summary disposition in defendants’ favor.
FACTS AND PROCEDURAL HISTORY
In April 2001, plaintiff Wayne County initiated actions to condemn nineteen parcels of land immediately south of Metropolitan Airport. The owners of those parcels, defendants in the present actions, maintain that these condemnations lack statutory authorization and exceed constitutional bounds.
This dispute has its roots in recent renovations of Metropolitan Airport. The county’s $2 billion construction program produced a new terminal and jet runway and, consequently, raised concerns that noise from increased air traffic would plague neighboring landowners. In an effort to obviate such problems, the county, funded by a partial grant of $21 million from the Federal Aviation Administration (FAA), began a program of purchasing neighboring properties through voluntary sales. Eventually, the county purchased approximately five hundred acres in nonadjacent plots scattered in a checkerboard pattern throughout an area south of Metropolitan Airport.
*452 Wayne County’s agreement with the FAA provided that any properties acquired through the noise abatement program were to be put to economically productive use. In order to fulfill this mandate, the county, through its Jobs and Economic Development Department, developed the idea of constructing a large business and technology park with a conference center, hotel accommodations, and a recreational facility. Thus, the “Pinnacle Project” was born.
The Pinnacle Project calls for the construction of a state-of-the-art business and technology park in a 1,300-acre area adjacent to Metropolitan Airport. The county avers that the Pinnacle Project will
create thousands of jobs, and tens of millions of dollars in tax revenue, while broadening the County’s tax base from predominantly industrial to a mixture of industrial, service and technology. The Pinnacle Project will enhance the image of the County in the development community, aiding in its transformation from a high industrial area, to that of an arena ready to meet the needs of the 21st century. This cutting-edge development will attract national and international businesses, leading to accelerated economic growth and revenue enhancement.
According to expert testimony at trial, it is anticipated that the Pinnacle Project will create thirty thousand jobs and add $350 million in tax revenue for the county.
The county planned to construct the business and technology park in a 1,300-acre area that included the five hundred acres purchased under the federally funded noise abatement program. Because the county needed to acquire more land within the project area, it began anew to solicit voluntary sales from area landowners. This round of sales negotiations enabled the county to purchase an additional five hundred acres within the project area.
*453 Having acquired over one thousand acres, the county determined that an additional forty-six parcels distributed in a checkerboard fashion throughout the project area were needed for the business and technology park. The county apparently determined that further efforts to negotiate additional voluntary sales would be futile and decided instead to invoke the power of eminent domain. Thus, on July 12, 2000, the Wayne County Commission adopted a Resolution of Necessity and Declaration of Taking (Resolution of Necessity) authorizing the acquisition of the remaining three hundred acres needed for the Pinnacle Project.
The remaining properties were appraised as required by the Uniform Condemnation Procedures Act (UCPA),[2] and the county issued written offers based on these appraisals to the property owners. Twenty-seven more property owners accepted these offers and sold their parcels to the county. But according to the county’s estimates, nineteen additional parcels were still needed for the Pinnacle Project. These properties, owned by defendants, are the subject of the present condemnation actions.
In late April 2001, plaintiff initiated condemnation actions under the UCPA In response, each property owner filed a motion to review the necessity of the proposed condemnations.[3] They argued, first, that the county lacked statutory authority to exercise the power of eminent domain in this manner. Second, defendants contended that acquisition of the subject properties was not necessary as required by statute. Finally, they challenged the constitutionality of these condemnation actions, maintaining that the Pinnacle Project would not serve a public purpose.
*454 An evidentiary hearing on the consolidated cases was held over four weeks in the Wayne Circuit Court. On December 19, 2001, the trial court affirmed the county’s determination of necessity. The court held that the takings were authorized by MCL 213.23, that the county did not abuse its discretion in determining that condemnation was necessary, and that the Pinnacle Project served a public purpose as defined by Poletown. The trial court denied defendants’ motions for reconsideration on January 24, 2002.
Defendants appealed the matter to the Court of Appeals, which granted leave on April 24, 2003. The Court of Appeals affirmed the trial court’s decision.[4] The panel concluded that the proposed condemnations passed statutory and constitutional muster under MCL 213.21 et seq. and our Poletown decision. Judge MURRAY, joined by Judge FITZGERALD, concurred with Presiding Judge O’CONNELL, but opined that Poletown was poorly reasoned, wrongly decided, and ripe for reversal by this Court.[5]
We granted defendants’ applications for leave to appeal on November 17,2003.[6] Our grant order directed the parties to the following issues:
(1) whether plaintiff has the authority, pursuant to MCL 213.23 or otherwise, to take defendants’ properties; (2) whether the proposed taking, which are at least partly intended to result in later transfers to private entities, are for a “public purpose,” pursuant to Poletown Neighborhood Council v Detroit, 410 Mich 616 (1981); and (3) whether the “public purpose” test set forth in Poletown, supra, is consistent with Const 1963, art 10, § 2 and, if not, whether *455 this test should be overruled. Further, the parties should discuss whether a decision overruling Poletown, supra, should apply retroactively or prospectively only, taking into consideration the reasoning in Pohutski v City of Allen Park, 465 Mich 675 (2002).
We also solicited briefs amicus curiae.
STANDARD of review
Statutory construction is a question of law subject to review de novo.[7] In the eminent domain context, the UCPA limits our review of a public agency’s determination that a condemnation is necessary. We may vacate an agency’s finding that a condemnation serves a public necessity only if a party establishes that the finding is predicated on “fraud, error of law, or abuse of discretion.”[8]
Constitutional issues, like questions of statutory construction, are subject to review de novo.[9]
ANALYSIS
A. MCL 213.23
Defendants, the property owners whose lands Wayne County now seeks to condemn, assert that the proposed takings exceed the county’s statutory and constitutional authority. If it were correct that the county lacks statutory authorization to condemn defendants’ properties, this Court need not — and must not, under well-established prudential principles — determine whether *456 the takings also violate our Constitution.[10] We begin, therefore, with the county’s contention that MCL 213.23 authorizes the proposed condemnations.
MCL 213.23 provides:
Any public corporation or state agency is authorized to take private property necessary for a public improvement or for the purposes of its incorporation or for public purposes within the scope of its powers for the use or benefit of the public and to institute and prosecute proceedings for that purpose. When funds have been appropriated by the legislature to a state agency or division thereof or the office of the governor or a division thereof for the purpose of acquiring lands or property for a designated public purpose, such unit to which the appropriation has been made is authorized on behalf of the people of the state of Michigan to acquire the lands or property either by purchase, condemnation or otherwise. For the purpose of condemnation the unit may proceed under the provisions of this act.
In interpreting this statutory language, this Court’s primary goal is to give effect to the Legislature’s intent.[11] If the Legislature has clearly expressed its intent in the language of a statute, that statute must be enforced as written, free of any “contrary judicial gloss.”[12]
Wayne County is a “public corporation” as the term is used in this statute,[13] and is therefore subject to the provisions of this section. Under MCL 213.23, a con *457 demnation must be “necessary” for one of three ends: “a public improvement or for the purposes [to be advanced by the public corporation or state agency’s] incorporation or for public purposes within the scope of [the corporation’s or agency’s] powers . . . Additionally, a proposed condemnation must be “for the use or benefit of the public ... .”[14]
Plaintiff does not argue that the takings at issue are a “public improvement” or that they advance purposes of the county’s incorporation. Consequently, this Court must determine only whether the proposed condemnations are necessary for public purposes, whether those purposes are within the scope of the county’s powers, and whether the takings are “for the use or benefit of the public ... .”[15]
1. “FOR PUBLIC PURPOSES WITHIN THE SCOPE OF ITS POWERS”
Wayne County’s assertion that the proposed condemnations are “for public purposes within the scope of its powers”[16] raises two discrete questions — first, whether Wayne County is authorized to exercise the power of eminent domain at all and, second, whether this particular exercise of the eminent domain power is within the county’s powers.
There is no question that the state possesses the power of eminent domain.[17] The state’s authority to *458 condemn private property for public use is preserved by our Constitution[18] and has been expressly acknowledged by this Court on a number of occasions.[19] But whether that eminent domain power extends to counties within the state is another matter.
Plaintiff argues that the Legislature has expressly conferred that power upon public corporations such as Wayne County through the plain language of MCL 213.23. This statute begins by stating that “[a]ny public corporation or state agency is authorized to take private property ... .”[20] Plaintiff argues that this language is a separate and independent delegation of the power to condemn private property for public purposes. Because § 23 “authoriz[es]” public corporations to condemn property in certain circumstances, a public corporation need not rely on any other statutory provision in order to exercise the power of eminent domain.
Defendants maintain, however, that plaintiffs reading renders the second sentence of MCL 213.23 a nullity. This sentence provides:
When funds have been appropriated by the legislature to a state agency or division thereof or the office of the governor or a division thereof for the purpose of acquiring lands or property for a designated public purpose, such unit to which the appropriation has been made is authorized on behalf of the people of the state of Michigan to acquire the lands or property either by purchase, condemnation or otherwise.[21]
If the first sentence of MCL 213.23 is a separate grant of authority to condemn, defendants argue, the second *459 sentence — which also confers the authorization to condemn land — is redundant.
A careful reading of MCL 213.23 reveals that this statute is indeed a separate grant of authority and, thus, that plaintiff has parsed this statute correctly. The first sentence of MCL 213.23 states that a public corporation such as Wayne County “is authorized” to condemn private property if the other preconditions of § 23 are met. To “authorize” is to “to give the authority or official power to” or “to empower.”[22] By its plain language, this first sentence is an affirmative grant of eminent domain power to public corporations and state agencies.
Contrary to defendants’ arguments, giving effect to the plain language of the first sentence does not render the remainder of § 23 nugatory. The second sentence applies only to condemnation by the state, its agencies or their divisions; thus, it applies to a subset of the groups covered by the first sentence. Further, it establishes a precondition to the condemnation for a public purpose designated by the Legislature — namely, the appropriation of funds to the state agency or division for that purpose. Finally, the second sentence, unlike the first, authorizes specific methods of exercising the power of eminent domain. Accordingly, the second sentence of MCL 213.23 does not alter the plain meaning of the first: Wayne County, as a public corporation, is authorized by MCL 213.23 to condemn property, albeit subject to other constitutional and statutory limitations.
The second question raised by the county’s reliance on the “for public purposes within the scope of its powers” phrase in § 23 is whether these particular condemnations are “within the scope of [Wayne County’s] powers.” *460 The power upon which plaintiff relies — the authority to condemn “for public purposes within the scope of its powers” — calls for an analysis of the scope of Wayne County’s “powers,” and an assessment of whether the proposed condemnations are within those powers.
Art 7, § 1 of our 1963 Constitution provides that “[e]ach organized county shall be a body corporate with powers and immunities provided by law.” The Constitution also declares that a county may codify in its charter the power “to adopt resolutions and ordinances relating to its concerns.”[23] These constitutional provisions are to be “liberally construed”:
The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution.[24]
Given the broad authority conferred by the Constitution upon local governments, this Court has acknowledged that Michigan “is a home rule state,” in which “local governments are vested with general constitutional authority to act on all matters of local concern not forbidden by state law.”[25] The Legislature has also recognized that the Michigan constitution establishes a system of home rule. The charter county act,[26] enacted in 1966, states that county charters may expressly provide for
[t]he authority to perform at the county level any function or service not prohibited by law, which shall *461 include, by way of enumeration and not limitation: Police protection, fire protection, planning, zoning, education, health, welfare, recreation, water, sewer, waste disposal, transportation, abatement of air and water pollution, civil defense, and any other function or service necessary or beneficial to the public health, safety, and general welfare of the county.[27]
Plaintiff Wayne County has claimed all the authority granted by these constitutional and statutory provisions. Its charter states:
Wayne County, a body corporate, possesses home rule power enabling it to provide for any matter of County concern and all powers conferred by the constitution or law upon charter counties or upon general law counties, their officers, or agencies.[28]
With this charter provision, Wayne County has claimed for itself the power to act in all matters not specifically reserved by statute or constitution to the state. The county’s “powers” include the authority to pursue any end that is “necessary or beneficial to the public health, safety, and general welfare” of the county,[29] assuming that the pursuit of that objective is not reserved by our Constitution or by statute to the state.
In this case, Wayne County has condemned the defendants’ real properties for the following purposes: “(1) the creation of jobs for its citizens, (2) the stimulation of private investment and redevelopment in the county to insure a healthy and growing tax base so that the county can fund and deliver critical public services, (3) stemming the tide of disinvestment and population loss, and (4) supporting development opportunities *462 which would otherwise remain unrealized.”[30] The analysis provided in this opinion demonstrates that, unless the pursuit of one or more of these objectives has been assigned to the state by law, any condemnation in furtherance of these goals is “within the scope of Wayne County’s powers,” as required by MCL 213.23. Defendants have adduced no constitutional or statutory support for the proposition that a home rule county such as Wayne County may not pursue these objectives. Accordingly, the proposed condemnations are — at least for statutory purposes — within the scope of Wayne County’s powers.
The pursuit of the goals cited above is within the scope of Wayne County’s powers, and each goal certainly advances a “public purpose.” A “public purpose” has been defined as that which “ ‘ “has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose.” ’ ”[31] A transition from a declining rustbelt economy to a growing, technology-driven economy would, no doubt, promote prosperity and general welfare. Consequently, the county’s goal of drawing commerce to metropolitan Detroit and its environs by converting the subject properties to a state-of-the-art technology and business park is within this definition of a “public purpose.”
That is not to say, of course, that the exercise of eminent domain in this case passes constitutional muster. While the proposed condemnations satisfy the *463 broad parameters established by MCL 213.23, it must also be determined whether these condemnations pass the more narrow requirements of our Constitution. We address this question later.
2. “NECESSARY”
For a public corporation to condemn property under MCL 213.23, a proposed taking must not only advance one of the three objectives listed in that statute, but it must also be “necessary” to that end. The Legislature has vested the authority to determine the necessity required under MCL 213.23 in those entities authorized to condemn private property under that statute.[32] Accordingly, Michigan’s courts are bound by a public corporation’s determination that a proposed condemnation serves a public necessity unless the party opposing the condemnation demonstrates “fraud, error of law, or abuse of discretion.”[33]
Defendants advance three basic arguments for the proposition that plaintiff has failed to establish that the takings are “necessary” as required by MCL 213.23 and therefore abused its discretion in condemning the subject properties. They contend, first, that the county has neither identified specific private purchasers for each of the defendants’ parcels nor demonstrated that the parcels will be put to productive use now or in the immediate future. Thus, defendants argue that Wayne County is impermissibly using the power of eminent domain to “stockpile” land for speculative future use, a *464 practice expressly prohibited fifty years ago in Grand Rapids Bd of Ed v Baczewski.[34]
We disagree. The proposed condemnations are quite unlike the exercise of eminent domain prohibited in Baczewski. There, a local board of education attempted to condemn property near a high school because it surmised that the high school would need to expand in approximately thirty years. The affected landowner challenged the condemnation under the 1908 Constitution,[35] which — in contrast to the 1963 Constitution[36]— expressly required any exercise of eminent domain to be “necessary.” This Court held that a condemnation is “necessary” only if the condemned property will be used “immediately” or “within a period of time that the jury determines to be the ‘near future’ or a ‘reasonably immediate use.’ ”[37] The speculative need for property in thirty years time lacked any of the urgency of a “necessary” condemnation.
Even if we grant, arguendo, that the definition of “necessity” under the 1908 Constitution applies to MCL 213.23 as well, the present case is nevertheless distinguishable from Baczewski. Whereas the school board in Baczewski admitted that it would not need the defendant’s property for thirty years after its condemnation, plaintiff has a definite plan for defendants’ *465 properties and intends to construct a business and technology park as soon as possible. According to the trial court’s summary of testimony at trial, the acquisition of defendants’ properties would also enable the county to achieve a “critical mass of property,” and would thereby facilitate investment in the project. Baczewski does not bar an exercise of the power of eminent domain simply because the ultimate owner of the condemned land has yet to be identified.
Second, defendants argue that the proposed condemnations are not “necessary” under MCL 213.23 because plaintiff must still clear a number of procedural hurdles in order to proceed with the Pinnacle Project. These include the need for a special exclusion from the FAA in order to use land acquired through the noise abatement program for the Pinnacle Project, environmental concerns that may arise if construction of the project disturbs extant wildlife habitats, and the creation of a local district finance authority and a tax increment finance plan under the Local Development Financing Act.[38]
This argument is unpersuasive. MCL 213.23 requires a proposed condemnation to be “necessary” to advance one of the specified purposes. It does not, however, require that the condemning authority clear all other statutory and procedural hurdles before commencing condemnation proceedings. In arguing that the plaintiff has failed to demonstrate necessity, defendants have essentially read new requirements into MCL 213.23.
Finally, defendants assert, without supporting argument, that plaintiff has failed to establish that “the [business and technology] park is necessary for the public.” Given defendants’ failure to brief the issue, this *466 Court may consider it abandoned.[39] In any event, the argument erroneously shifts the burden of proof to plaintiff when the party opposing condemnation bears the burden of proving fraud, error of law, or abuse of discretion by the condemning authority.[40]
3. “FOR THE USE OR BENEFIT OF THE PUBLIC”
A condemnation that is necessary for a public purpose within the scope of the condemning authority’s powers must also be “for the use or benefit of the public” in order to be valid under MCL 213.23. There is ample evidence in the record that the Pinnacle Project would benefit the public. The development is projected to bring jobs to the struggling local economy, add to tax revenues and thereby increase the resources available for public services, and attract investors and businesses to the area, thereby reinvigorating the local economy.
In fact, defendants do not dispute that the proposed condemnations would benefit the public. Instead, relying on City of Lansing v Edward Rose Realty, Inc,[41] defendants argue that the benefits that private parties will receive through the Pinnacle Project outweigh any benefits that the general public is likely to receive and, therefore, that plaintiff has failed to establish a “public use or benefit.”
The two Edward Rose passages on which defendants rely, however, concern issues quite distinct from those under consideration here. The Edward Rose Court first engaged in a balancing of public and private interests in *467 addressing whether a city ordinance authorizing the condemnation of private property was a legitimate exercise of the general authority conferred upon Lansing as a home rule city.[42] The Court then returned to the balancing of public and private interests when evaluating the city’s ordinance under the “heightened scrutiny” test of Poletown,[43] Neither passage concerns the meaning of the phrase “public benefit,” much less the meaning of “public benefit” as used in MCL 213.23. Moreover, Edward Rose nowhere suggests that the “public use or benefit” element of MCL 213.23 requires a balancing of public and private benefits, or that public benefits must predominate over private ones under this statute. As such, defendants have failed to persuade us that the proposed condemnations will fail to provide a “public benefit” within the meaning of MCL 213.23.
On the basis of the foregoing analysis, we conclude that the condemnations sought by Wayne County are consistent with MCL 213.23 and that this statute is a separate and independent grant of eminent domain authority to public corporations such as Wayne County. If the authority to condemn private property conferred by the Legislature lacked any constitutional limits, this Court would be compelled to affirm the decisions of the circuit court and the Court of Appeals. But our state Constitution does, in fact, limit the state’s power of eminent domain. Therefore, it must be determined whether the proposed condemnations pass constitutional muster.
B. ART 10, § 2
Art 10, § 2 of Michigan’s 1963 Constitution provides that “[p]rivate property shall not be taken for public use *468 without just compensation therefor being first made or secured in a manner prescribed by law.” Defendants contend that the proposed condemnations are not “for public use,” and therefore are not within constitutional bounds. Accordingly, our analysis must now focus on the “public use” requirement of art 10, § 2.
1. "PUBLIC USE” AS A LEGAL TERM OF ART
The primary objective in interpreting a constitutional provision is to determine the text’s original meaning to the ratifiers, the people, at the time of ratification.[44] This rule of “common understanding” has been described by Justice COOLEY in this way:
“A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. ‘For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.’ ”[45]
In short, the primary objective of constitutional interpretation is to realize the intent of the people by whom and for whom the constitution was ratified.
This Court typically discerns the common understanding of constitutional text by applying each term’s *469 plain meaning at the time of ratification.[46] But if the constitution employs technical or legal terms of art, “we are to construe those words in their technical, legal sense.”[47] Justice COOLEY has justified this principle of constitutional interpretation in this way:
[I]t must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history, and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense. When the law speaks of an ex post facto law, it means a law technically known by that designation; the meaning of the phrase having become defined in the history of constitutional law, and being so familiar to the people that it is not necessary to employ language of a more popular character to designate it. The technical sense in these cases is the sense popularly understood, because that is the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights.[48]
*470 Thus, in Silver Creek, for example, we determined that the phrase “just compensation” was a legal term of art of enormous complexity, and that its meaning could be discerned only by canvassing legal precedent on “just compensation” before 1963 to determine how an indi *471 vidual versed in the law before the Constitution’s ratification would understand that concept.[49] Indeed, we have held that the whole of art 10, § 2 has a technical meaning that must be discerned by examining the “purpose and history” of the power of eminent domain.[50]
“Public use” is a legal term of art every bit as complex as “just compensation.” It has reappeared as a positive limit on the state’s power of eminent domain in Michigan’s constitutions of 1850,[51] 1908,[52] and 1963,[53] and each invocation of “public use” has been followed by litigation over the precise contours of this language. Consequently, this Court has weighed in repeatedly on the meaning of this legal term of art. We can uncover the common understanding of art 10, § 2 only by delving into this body of case law, and thereby determining the “common understanding” among those sophisticated in the law at the time of the Constitution’s ratification.
This case does not require that this Court cobble together a single, comprehensive definition of “public use” from our pre-1963 precedent and other relevant sources. The question presented here is a fairly discrete one: are the condemnation of defendants’ properties and the subsequent transfer of those properties to private entities pursuant to the Pinnacle Project consistent with the common understanding of “public use” *472 at ratification? For the reasons stated below, we answer that question in the negative.
2. “PUBLIC USE” AND PRIVATE OWNERSHIP
When our Constitution was ratified in 1963, it was well-established in this Court’s eminent domain jurisprudence that the constitutional “public use” requirement was not an absolute bar against the transfer of condemned property to private entities.[54] It was equally clear, however, that the constitutional “public use” requirement worked to prohibit the state from transferring condemned property to private entities for a private use.[55] Thus, this Court’s eminent domain jurisprudence — at least that portion concerning the reasons for which the state may condemn private property — has focused largely on the area between these poles.
Justice RYAN’s Poletown dissent accurately describes the factors that distinguish takings in the former category from those in the latter according to our pre-1963 eminent domain jurisprudence.[56] Accordingly, we conclude that the transfer of condemned property is a “public use” when it possesses one of the three characteristics in our pre-1963 case law identified by Justice Ryan.
*473 First, condemnations in which private land was constitutionally transferred by the condemning authority to a private entity involved “public necessity of the extreme sort otherwise impracticable.”[57] The “necessity” that Justice RYAN identified in our pre-1963 case law is a specific kind of need:
[T]he exercise of eminent domain for private corporations has been limited to those enterprises generating public benefits whose very existence depends on the use of land that can be assembled only by the coordination central government alone is capable of achieving.[58]
Justice RYAN listed “highways, railroads, canals, and other instrumentalities of commerce” as examples of this brand of necessity.[59] A corporation constructing a railroad, for example, must lay track so that it forms a more or less straight path from point A to point B. If a property owner between points A and B holds out — say, for example, by refusing to sell his land for any amount less than fifty times its appraised value — the construction of the railroad is halted unless and until the railroad accedes to the property owner’s demands. And if owners of adjoining properties receive word of the original property owner’s windfall, they too will refuse to sell.
The likelihood that property owners will engage in this tactic makes the acquisition of property for railroads, gas lines, highways, and other such “instrumentalities of commerce” a logistical and practical nightmare. Accordingly, this Court has held that the exercise of eminent domain in such cases — in which collective action is needed to acquire land for vital instrumentali *474 ties of commerce — is consistent with the constitutional “public use” requirement.[60]
Second, this Court has found that the transfer of condemned property to a private entity is consistent with the constitution’s “public use” requirement when the private entity remains accountable to the public in its use of that property.[61] Indeed, we disapproved of the use of eminent domain in Portage Twp Bd of Health in part because the entity acquiring the condemned land would not be subject to public oversight.[62] As Justice RYAN observed:
[T]his Court disapproved condemnation that would have facilitated the generation of water power by a private corporation because the power company “will own, lease, use, and control” the water power. In addition, [we] warned, “Land cannot be taken, under the exercise of the power of eminent domain, unless, after it is taken, it will be devoted to the use of the public, independent of the will of the corporation taking it. ”[63]
In contrast, we concluded in Lakehead Pipe Line Co v Dehn that the state retained sufficient control of a petroleum pipeline constructed by the plaintiff on condemned property.[64] We noted specifically that the plain *475 tiff had “pledged itself to transport in intrastate commerce,”[65] that plaintiffs pipeline was used pursuant to directions from the Michigan Public Service Commission, and that the state would be able to enforce those obligations, should the need arise.[66]
Thus, in the common understanding of those sophisticated in the law at the time of ratification, the “public use” requirement would have allowed for the transfer of condemned property to a private entity when the public retained a measure of control over the property.
Finally, condemned land may be transferred to a private entity when the selection of the land to be condemned is itself based on public concern.[67] In Justice Ryan’s words, the property must be selected on the basis of “facts of independent public significance,” meaning that the underlying purposes for resorting to condemnation, rather than the subsequent use of condemned land, must satisfy the Constitution’s public use requirement.
The primary example of a condemnation in this vein is found in In re Slum Clearance,[68] a 1951 decision from this Court. In that case, we considered the constitutionality of Detroit’s condemnation of blighted housing and its subsequent resale of those properties to private persons. The city’s controlling purpose in condemning the properties was to remove unfit housing and thereby advance public health and safety; subsequent resale of the land cleared of blight was “incidental” to this goal.[69] We concluded, therefore, that the condemnation was *476 indeed a “public use,” despite the fact that the condemned properties would inevitably be put to private use. In re Slum Clearance turned on the fact that the act of condemnation itself, rather than the use to which the condemned land eventually would be put, was a public use.[70] Thus, as Justice RYAN observed, the condemnation was a “public use” because the land was selected on the basis of “facts of independent public significance”[71] — namely, the need to remedy urban blight for the sake of public health and safety.
The foregoing indicates that the transfer of condemned property to a private entity, seen through the eyes of an individual sophisticated in the law at the time of ratification of our 1963 Constitution, would be appropriate in one of three contexts: (1) where “public necessity of the extreme sort” requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property is selected because of “facts of independent public significance,” rather than the interests of the private entity to which the property is eventually transferred.[72]
3. POLETOWN, THE PINNACLE PROJECT, AND PUBLIC USE
The exercise of eminent domain at issue here — the condemnation of defendants’ properties for the Pinnacle Project and the subsequent transfer of those properties to private entities — implicates none of the saving elements noted by our pre-1963 eminent domain jurisprudence.
*477 The Pinnacle Project’s business and technology park is certainly not an enterprise “whose very existence depends on the use of land that can be assembled only by the coordination central government alone is capable of achieving.”[73] To the contrary, the landscape of our country is flecked with shopping centers, office parks, clusters of hotels, and centers of entertainment and commerce. We do not believe, and plaintiff does not contend, that these constellations required the exercise of eminent domain or any other form of collective public action for their formation.
Second, the Pinnacle Project is not subject to public oversight to ensure that the property continues to be used for the commonweal after being sold to private entities. Rather, plaintiff intends for the private entities purchasing defendants’ properties to pursue their own financial welfare with the single-mindedness expected of any profit-making enterprise. The public benefit arising from the Pinnacle Project is an epiphenomenon of the eventual property owners’ collective attempts at profit maximization. No formal mechanisms exist to ensure that the businesses that would occupy what are now defendants’ properties will continue to contribute to the health of the local economy.
Finally, there is nothing about the act of condemning defendants’ properties that serves the public good in this case. The only public benefits cited by plaintiff arise after the lands are acquired by the government and put to private use. Thus, the present case is quite unlike Slum Clearance because there are no facts of independent public significance (such as the need to promote health and safety) that might justify the condemnation of defendants’ lands.
*478 We can only conclude, therefore, that no one sophisticated in the law at the 1963 Constitution’s ratification would have understood “public use” to permit the condemnation of defendants’ properties for the construction of a business and technology park owned by private entities. Therefore, the condemnations proposed in this case are unconstitutional under art 10, § 2.
Indeed, the only support for plaintiffs position in our eminent domain jurisprudence is the majority opinion in Poletown. In that opinion per curiam, a majority of this Court concluded that our Constitution permitted the Detroit Economic Development Corporation to condemn private residential properties in order to convey those properties to a private corporation for the construction of an assembly plant.[74]
As an initial matter, the opinion contains an odd but telling internal inconsistency. The majority first acknowledges that the property owners in that case “urge[d the Court] to distinguish between the terms ‘use’ and ‘purpose’, asserting they are not synonymous and have been distinguished in the law of eminent domain.”[75] This argument, of course, was central to the plaintiffs’ case, because the Constitution allows the exercise of eminent domain only for a “public use.”[76] The Court then asserted that the plaintiffs conceded that the Constitution allowed condemnation for a “public use” or a “public purpose,” despite the fact that such a concession would have dramatically undermined the plaintiffs’ argument:
There is no dispute about the law. All agree that condemnation for a public use or purpose is permitted. ... *479 The heart of this dispute is whether the proposed condemnation is for the primary benefit of the public or the private user.[77]
The majority therefore contended that the plaintiffs waived a distinction they had “urged” upon the Court. And in so doing, the majority was able to avoid the difficult question whether the condemnation of private property for another private entity was a “public use” as that phrase is used in our Constitution.[78]
This inconsistency aside, the majority opinion in Poletown is most notable for its radical and unabashed departure from the entirety of this Court’s pre-1963 eminent domain jurisprudence. The opinion departs from the “common understanding” of “public use” at the time of ratification in two fundamental ways.
First, the majority concluded that its power to review the proposed condemnations is limited because
“[t]he determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such determination is palpable and manifestly arbitrary and incorrect.”[79]
The majority derived this principle from a plurality opinion of this Court[80] and supported the application of the principle with a citation of an opinion of the United States Supreme Court concerning judicial review of *480 congressional acts under the Fifth Amendment of the federal constitution.[81] Neither case, of course, is binding on this Court in construing the takings clause of our state Constitution, and neither is persuasive authority for the use to which they were put by the Poletown majority.
It is not surprising, however, that the majority would turn to nonbinding precedent for the proposition that the Court’s hands were effectively tied by the Legislature. As Justice RYAN’s dissent noted:
In point of fact, this Court has never employed the minimal standard of review in an eminent domain case which is adopted by the [Poletown] majority .... Notwithstanding explicit legislative findings, this Court has always made an independent determination of what constitutes a public use for which the power of eminent domain may be utilized.[82]
Our eminent domain jurisprudence since Michigan’s entry into the union amply supports Justice RYAN’s assertion.[83] Questions of public purpose aside, whether the proposed condemnations were consistent with the Constitution’s “public use” requirement was a constitutional question squarely within the Court’s authority.[84] The Court’s reliance on Gregory Marina and *481 Berman for the contrary position was, as Justice RYAN observed, “disingenuous.”[85]
Second, the Poletown majority concluded, for the first time in the history of our eminent domain jurisprudence, that a generalized economic benefit was sufficient under art 10, § 2 to justify the transfer of condemned property to a private entity. Before Poletown, we had never held that a private entity’s pursuit of profit was a “public use” for constitutional takings purposes simply because one entity’s profit maximization contributed to the health of the general economy.
Justice COOLEY considered a similar proposition[86] well over a century ago and held that incidental benefits to the economy did not justify the exercise of eminent domain for private, water-powered mills:
The statute [allowing the condemnation of private property for the construction of private powermills] appears to have been drawn with studious care to avoid any requirement that the person availing himself of its provisions shall consult any interest except his own, and it therefore seems perfectly manifest that when a public use is spoken of in this statute nothing further is intended than that the use shall be one that, in the opinion of the commission or jury, will in some manner advance the public interest. But incidentally every lawful business does this.[87]
Justice COOLEY was careful to point out that the Court was not ruling out the possibility that “incidental benefits to the public” might, in some cases, “justify an *482 exercise of the right of eminent domain.”[88] But Wayne County has not directed us to a single case, other than Poletown, holding that a vague economic benefit stemming from a private profit-maximizing enterprise is a “public use.”
Every business, every productive unit in society, does, as Justice COOLEY noted, contribute in some way to the commonweal.[89] To justify the exercise of eminent domain solely on the basis of the fact that the use of that property by a private entity seeking its own profit might contribute to the economy’s health is to render impotent our constitutional limitations on the government’s power of eminent domain. Poletown’s “economic benefit” rationale would validate practically any exercise of the power of eminent domain on behalf of a private entity. After all, if one’s ownership of private property is forever subject to the government’s determination that another private party would put one’s land to better use, then the ownership of real property is perpetually threatened by the expansion plans of any large discount retailer, “megastore,” or the like. Indeed, it is for precisely this reason that this Court has approved the transfer of condemned property to private entities only when certain other conditions — those identified in our pre-1963 eminent domain jurisprudence in Justice RYAN’s Poletown dissent — are present.[90]
Because Poletown’s conception of a public use — that of “alleviating unemployment and revitalizing the economic base of the community”[91] — has no support in the Court’s eminent domain jurisprudence before the Constitution’s ratification, its interpretation of “public use” *483 in art 10, § 2 cannot reflect the common understanding of that phrase among those sophisticated in the law at ratification. Consequently, the Poletown analysis provides no legitimate support for the condemnations proposed in this case and, for the reasons stated above, is overruled.
We conclude that the condemnations proposed in this case do not pass constitutional muster because they do not advance a public use as required by Const 1963, art 10, § 2. Accordingly, this case is remanded to the Wayne Circuit Court for entry of summary disposition in defendants’ favor.
C. RETROACTIVITY
In the process of determining that the proposed condemnations cannot pass constitutional muster, we have concluded that this Court’s Poletown opinion is inconsistent with our eminent domain jurisprudence and advances an invalid reading of our Constitution. Because that decision was in error and effectively rendered nugatory the constitutional public use requirement, it must be overruled.[92]
It is true, of course, that this Court must not “lightly overrule precedent.”[93] But because Poletown itself was such a radical departure from fundamental constitutional principles and over a century of this Court’s eminent domain jurisprudence leading up to the 1963 Constitution, we must overrule Poletown in order to vindicate our Constitution, protect the people’s property rights, and preserve the legitimacy of the judicial branch as the expositor — not creator — of fundamental law.[94]
*484 In the twenty-three years since our decision in Pole-town, it is a certainty that state and local government actors have acted in reliance on its broad, but erroneous, interpretation of art 10, § 2. Indeed, Wayne County's course of conduct in the present case was no doubt shaped by Poletown’s disregard for constitutional limits on the exercise of the power of eminent domain and the license that opinion appeared to grant to state and local authorities.
Nevertheless, there is no reason to depart from the usual practice of applying our conclusions of law to the case at hand.[95] Our decision today does not announce a new rule of law, but rather returns our law to that which existed before Poletown and which has been mandated by our Constitution since it took effect in 1963.[96] Our decision simply applies fundamental constitutional principles and enforces the “public use” requirement as that phrase was used at the time our 1963 Constitution was ratified.[97]
Therefore, our decision to overrule Poletown should have retroactive effect, applying to all pending cases in which a challenge to Poletown has been raised and preserved.[98]
*485 CONCLUSION
We conclude that the condemnation of defendants’ properties is consistent with MCL 213.23. However, we also hold that the proposed condemnations do not advance a “public use” as required by art 10, § 2 of our 1963 Constitution. Therefore, the decisions of the lower courts are reversed and this matter is remanded for entry of an order of summary disposition in defendants’ favor.
CORRIGAN, C.J., and Taylor and MARKMAN, JJ., concurred with Young, J.

 410 Mich 616; 304 NW2d 455 (1981).

 MCL 213.51 et seq.

 See MCL 213.56.

 Unpublished opinion per curiam, issued April 24, 2003 (Docket Nos. 239438, 239563, 240187, 240189, 240190, 240193-420195).

 Slip op at 5-6 (Murray, J., concurring).

 469 Mich 952 (2003).

 Morales v Auto-Owners Ins Co (After Remand), 469 Mich 487, 490; 672 NW2d 849 (2003).

 MCL 213.56(2).

 People v Nutt, 469 Mich 565, 573; 677 NW2d 1 (2004).

 Federated Publications, Inc v Michigan State Univ Bd of Trustees, 460 Mich 75, 93; 594 NW2d 491 (1999) (Cavanagh, J., concurring in part and dissenting in part) (noting a “longstanding rule [that] requires us to consider constitutional questions only as a last resort, and to avoid such questions where a nonconstitutional basis exists for resolving the matter”).

 Morales, supra at 490.

 Id.

 Const 1963, art 7, § 1 (“Each organized county shall be a body corporate with powers and immunities provided by law.”); MCL 213.21 (“The term ‘public corporations’ as herein used shall include all counties, *457 cities, villages, boards, commissions and agencies made corporations for the management and control of public business and property .. ..”).

 Id.

 MCL 213.23

 Id.

 Peterman v Dep’t of Natural Resources, 446 Mich 177, 185; 521 NW2d 499 (1994) (“ ‘[E]ach State by virtue of its statehood has the right to exercise the power of eminent domain.’ ”), quoting Loomis v Hartz, 165 Mich 662, 665; 131 NW 85 (1911).

 Const 1963, art 10, § 2.

 See, for example, Peterman, supra at 185-186, quoting People ex rel Trombley v Humphrey, 23 Mich 471, 474 (1871).

 MCL 213.23 (emphasis added).

 Id.

 Random House Webster’s Unabridged Dictionary (2d ed, 2001).

 Const 1963, art 7, § 2.

 Const 1963, art 7, § 34.

 Airlines Parking v Wayne Co, 452 Mich 527, 537 n 18; 550 NW2d 490 (1996).

 MCL 45.501 et seq.

 MCL 45.515(c) (emphasis added).

 Wayne County Charter, § 1.112.

 See MCL 45.515(c).

 Quoted from complaint for condemnation.

 Gaylord v Gaylord City Clerk, 378 Mich 273, 300; 144 NW2d 460 (1966), quoting Hays v Kalamazoo, 316 Mich 443, 454; 25 NW2d 787 (1947), quoting 37 Am Jur, Municipal Corporations, § 120, p 734.

 MCL 213.56(2) (“With respect to an acquisition by a public agency, the determination of public necessity by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion.”).

 Id. See also Detroit v Lucas, 180 Mich App 47, 53; 446 NW2d 596 (1989).

 Grand Rapids Bd of Ed v Baczewski, 340 Mich 265, 272; 65 NW2d 810 (1954).

 Const 1908, art 13, § 1 (“Private property shall not he taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law.”).

 Const 1963, art 10, § 2 (“Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law. Compensation shall he determined in proceedings in a court of record.”).

 Baczewski, supra at 272.

 MCL 125.2151 et seq.

 Gross v Gen Motors Corp, 448 Mich 147, 162 n 8; 528 NW2d 707 (1995).

 See n 14, supra, and accompanying text.

 City of Lansing v Edward Rose Realty, Inc, 442 Mich 626; 502 NW2d 638 (1993).

 Id. at 634-635.

 Poletown, supra at 634-635.

 Nutt, supra at 573.

 Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971) (emphasis in original), quoting Cooley’s Constitutional Limitations 81.

 Silver Creek, supra at 375.

 Id.

 1 Cooley, Constitutional Limitations (8th ed), pp 130-133. See also In re Payne, 444 Mich 679, 707 n 6; 512 NW2d 121 (1994) (Riley, J., concurring in part and dissenting in part) (quoting a portion of this passage).
Justice Cooley recognized, as demonstrated by the passage cited above, that, in ratifying a constitution, the people may understand that certain terms used in that document have a technical meaning within the law. Therefore, the people may ratify a constitution with the understanding that it incorporates legal terms of art — or, in Justice Cooley’s terms, words “employed in their technical sense.” Cooley, supra at 132.
When one actually engages in the mode of analysis described by Justice Cooley and quoted by Justice Weaver, one need look no farther *470 than the Cooley treatise upon which the concurrence relies to see that “public use” is indeed a term of art. See Cooley, Constitutional Limitations (5th ed, 1998), pp 657-666. After surveying some of the many judicial opinions wrestling with this concept, Justice Cooley concludes: “But accepting as correct the decisions which have been made, it must be conceded that the term ‘public use’ as employed in the law of eminent domain, has a meaning much controlled by the necessity, and somewhat different from that which it bears generally.” Cooley, Constitutional Limitations (5th ed, 1998), pp 664-665 (emphasis added). See also id. at 659 (“We find ourselves somewhat at sea, however, when we undertake to define in the light of the judicial decisions, what constitutes a public use.”).
Thus, the notion that the meaning of “public use” was “commonly understood by the people, learned and unlearned, who ratified the constitution,” post at 499, is one that would have been quite foreign to Justice Cooley. In fact, this eminent jurist admitted to being “somewhat at sea” in attempting to cull a single definition of “public use” from the complex case law on the power of eminent domain. Cooley, supra at 659. This admission from our patron saint of constitutional interpretation stands in stark contrast to fictionalized “common understanding” proffered by the concurring opinion.
Frankly, we are hard pressed to understand what differentiates Justice Weaver’s construction from our own. Justice Weaver herself acknowledges that “public use” must be read as a technical term. See post at 497-498. Justice Weaver’s recognition that “public use” must be read in light of its “legal and constitutional history” is precisely our point.
If there is any meaningful difference between reading a constitutional term according to its legal history because the ratifiers understood that the term was one with a technical meaning (our position) or because the ratifiers themselves were familiar with that legal history (Justice Weaver’s position) it is one we find difficult to discern. Under either Justice Weaver’s locution or ours, “public use” is read according to its “legal and constitutional history.” Thus, it cannot be the case that our test leads more easily to “elitist” abuse than hers, since Justice Weaver’s “common understanding” approach is indistinguishable in result from our own.

 Silver Creek, supra at 376.

 Peterman, supra at 186-187.

 See Const 1850, art 15, § 9. (“The property of no person shall be taken by any corporation for pubbc use, without compensation being first made or secured, in such manner as may be prescribed by law.”).

 See note 35.

 See note 36.

 This fact is also noted by Justice Ryan in his Poletown dissent. Poletown, supra at 670.

 See, e.g., Bd of Health of Portage Twp v Van Hoesen, 87 Mich 533; 49 NW 894 (1891) (dismissing a petition seeking the condemnation of private property for use as a cemetery).

 Poletown, supra at 674-681. Although Justice Ryan viewed these common elements as “exceptions” to the general rule against condemnations for private use, the three exceptions reflect concepts that are incorporated into the definition of “public use,” given the principles of constitutional interpretation articulated above.

 Id. at 675 (Ryan, J., dissenting).

 Id. at 676 (emphasis in original).

 Id. at 675.

 See, e.g., Swan v Williams, 2 Mich 427 (1852) (holding that the condemnation of private property by a railroad company was consistent with the eminent domain provision of the federal constitution and the Northwest Ordinance of 1787).

 Poletown, supra at 677 (Ryan, J., dissenting), quoting Swan, supra at 439-440 (“ ‘By the terms of the charter the title to the lands is contingent upon their occupation as a railroad. It is vested in the company so long as they are used for a railroad, and no longer.’”).

 Poletown, supra at 677 (Ryan, J., dissenting), quoting Portage Twp Bd of Health, supra at 539.

 Poletown, supra at 678 (Ryan, J., dissenting) (emphasis in original; citations omitted), quoting Berrien Springs Water-Power Co v Berrien Circuit Judge, 133 Mich 48, 51, 53; 94 NW 379 (1903).

 Lakehead PipeLine Co v Dehn, 340 Mich 25; 64 NW2d 903 (1954).

 Id. at 42.

 Id. at 41-42.

 Poletown, supra at 680 (Ryan, J., dissenting).

 In re Slum Clearance, 331 Mich 714; 50 NW2d 340 (1951), is cited in Poletown, supra at 680 (Ryan, J., dissenting).

 Id. at 721.

 In re Slum Clearance, supra at 720.

 Poletown, supra at 680 (Ryan, J., dissenting).

 Id. at 674-681 (Ryan, J., dissenting).

 Id. at 676 (Ryan, J., dissenting).

 Id. at 628-629.

 Id. at 629-630.

 Const 1963, art 10, § 2 (emphasis added).

 Poletown, supra at 632.

 Moreover, as Justice Ryan noted, the majority also conflated the broad construction of “public purpose” in our taxation jurisprudence with the more limited construction of “public purpose” in the eminent domain context. See id. at 665-667.

 Id. at 632, quoting Gregory Marina, Inc v Detroit, 378 Mich 364, 396; 144 NW2d 503 (1966) (plurality opinion).

 Gregory Marina, supra.

 Berman v Parker, 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954). Justice Ryan noted in his Poletown dissent that the majority’s reliance on this case “[was] particularly disingenuous.” Poletown, supra at 668.

 Id. at 669 (emphasis in original).

 See, e.g., Shizas v City of Detroit, 333 Mich 44; 52 NW2d 589 (1952) (holding that the proposed condemnation was unconstitutional); similarly Portage Twp Bd of Health, supra; Ryerson v Brown, 35 Mich 333 (1877); Trombley, supra.

 See, e.g., Lakehead Pipe Line Co v Dehn, 340 Mich 25, 39; 64 NW2d 903 (1954) (“ ‘The question of whether the proposed use is a public use is a judicial one.’”), quoting Cleveland v Detroit, 332 Mich 172, 179; 33 NW2d 747 (1948).

 Poletown, supra at 668 (Ryan, J., dissenting).

 Ryerson, supra at 337 (“An examination of the adjudged cases will show that the courts, in looking about for the public use that was to he accommodated by the statute, have sometimes attached considerable importance to the fact that the general improvement of mill sites, as property possessing great value if improved, and often nearly worthless if not improved, would largely conduce to the prosperity of the state.”).

 Id. at 339.

 Id.

 Id.

 See part B(2).

 Poletown, supra at 634.

 Pohutski v City of Allen Park, 465 Mich 675, 695; 641 NW2d 219 (2002).

 Id. at 693.

 Id. at 695.

 See, e.g., Lesner v Liquid Disposal, 466 Mich 95, 108; 643 NW2d 553 (2002).

 Pohutski, supra at 696.

 See Baughman, Justice Moody’s lament unanswered: Michigan’s unprincipled retroactivity jurisprudence, 79 Mich B J 664 (2000), quoting Cooley, Constitutional Limitations, 91 (“When the Michigan Supreme Court exercises the judicial power,’ it is, as said by Justice Cooley, concerned with a determination of what the existing law is, even in ‘changing’ a mistaken interpretation, rather than making a ‘predetermination of what the law shall be for the regulation of all future cases,’ which is an act that ‘distinguishes a legislative act from a judicial one.’”).

 We disagree with Justice Cavanagh’s conclusion that this decision should apply prospectively. First, this case presents none of the exigent circumstances that warranted the “extreme measure” of prospective *485 application in Pohutski v City of Allen Park. Gladych v New Family Homes, Inc, 468 Mich 594, 606 n 6; 664 NW2d 705 (2003. Second, there is a serious question as to whether it is constitutionally legitimate for this Court to render purely prospective opinions, as such rulings are, in essence, advisory opinions. The only instance in which we are constitutionally authorized to issue an advisory opinion is upon the request of either house of the Legislature or the Governor — and, then, only “on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.” Const 1963 art 3, § 8. Furthermore, this Court has recognized that “[c]omplete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law.” Hyde v Univ of Mich Bd of Regents, 426 Mich 223, 240; 393 NW2d 847 (1986). Because Poletown was a radical departure from our eminent domain jurisprudence, it is hardly the “clear and uncontradicted case law” contemplated by Hyde.