**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Clifford W. Taylor    Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED MARCH 28, 2007

CITY OF MT. PLEASANT,

    Petitioner-Appellant,

v    No. 129453

STATE TAX COMMISSION,

    Respondent-Appellee.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

We granted leave to appeal in this case to determine whether MCL 211.7m exempts property from taxation on the basis that it is "used for public purposes" when a city acquires property and implements a plan to use the property for economic development purposes. Because the city of Mt. Pleasant used the property at issue for public purposes when it acquired and improved the land for resale for economic development, we hold that the property was exempt from taxation under MCL 211.7m. The Michigan Tax Tribunal made an error of law when it concluded otherwise; therefore, we reverse the judgment of the Court of Appeals that affirmed the judgment of the Tax Tribunal.

I. STATEMENT OF FACTS AND PROCEEDINGS

In 1990, petitioner city of Mt. Pleasant purchased over 320 acres of vacant land adjacent to its border and annexed the property. The city's stated purpose for purchasing the land was to allow for the extension of city streets that would connect to a "ring road" around the city; widen and extend various streets; provide land for needed housing, much of which would be low-income housing; and plat and prepare land for sale to developers for residential, commercial, and industrial uses to increase the city's tax base.

The property was initially treated as tax-exempt on the assessment rolls. However, the city assessor asked respondent State Tax Commission for guidance in assessing the property, and the city assessor was eventually told to treat the property as taxable property. The city objected to that assessment before the local board of review, but the assessment was affirmed. The city then proceeded with petitions before the Michigan Tax Tribunal asking for a ruling that the property was exempt under MCL 211.7m.

On October 31, 2003, the Tax Tribunal issued its decision, concluding that the property was not exempt and that the city was required to pay two years of back taxes on the property. The Tax Tribunal stated that the city was not entitled to the exemption because the city did not make a "present" use of the property. The Tax Tribunal did not view acquiring and improving the property for economic development as a present use.

The city appealed to the Court of Appeals. The Court of Appeals affirmed the judgment of the Tax Tribunal, concluding that the city's use of the property was not an "active, actual" use and, therefore, did not qualify for an exemption under MCL 211.7m. *Mt Pleasant v State Tax Comm*, 267 Mich App 1, 5; 703 NW2d 227 (2005). The Court of Appeals then denied the city's motion for reconsideration, and this Court granted the city's application for leave to appeal. 474 Mich 1001 (2006).

## II. STANDARD OF REVIEW

The proper interpretation of a statutory provision is a question of law that this Court reviews de novo. *Lincoln v Gen Motors Corp*, 461 Mich 483, 489-490; 607 NW2d 73 (2000). Additionally, appellate review of Michigan Tax Tribunal decisions is limited. *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 482; 473 NW2d 636 (1991). "All factual findings are final if supported by competent and substantial evidence." *Id*. "In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation." Const 1963, art 6, § 28.

## III. ANALYSIS

This case involves an issue of statutory interpretation. "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). The first step is to review the language of the statute. *Id*. If the statutory language is

3

unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute and judicial construction is not permissible. *Id*.

The statutory provision at issue in this case provides, in relevant part, as follows:

> Property owned by, or being acquired pursuant to, an installment purchase agreement by a county, township, city, village, or school district *used for public purposes* and property owned or being acquired by an agency, authority, instrumentality, nonprofit corporation, commission, or other separate legal entity comprised solely of, or which is wholly owned by, or whose members consist solely of a political subdivision, a combination of political subdivisions, or a combination of political subdivisions and the state and is used to carry out a public purpose itself or on behalf of a political subdivision or a combination is exempt from taxation under this act. [MCL 211.7m (emphasis added).]

This Court has previously stated that a "public purpose" promotes "'public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation . . . .'" *Gregory Marina, Inc v Detroit*, 378 Mich 364, 396; 144 NW2d 503 (1966), quoting 37 Am Jur, Municipal Corporations, § 120, p 734; see also *City of Gaylord v Gaylord City Clerk*, 378 Mich 273, 299-301; 144 NW2d 460 (1966); *Hays v City of Kalamazoo*, 316 Mich 443, 454; 25 NW2d 787 (1947). This Court has also recently stated in *Wayne Co v Hathcock*, 471 Mich 445, 461-462; 684 NW2d 765 (2004), that economic development constitutes a "public purpose." This Court stated that creating jobs for Michigan's citizens and stimulating private investment and redevelopment to ensure a healthy and growing tax base are examples of goals that

4

advance a public purpose. Drawing commerce to an area promotes prosperity and the general welfare. While these goals did not meet the narrow constitutional requirements at issue in *Hathcock*, the definition of what constitutes a "public purpose" does not change merely because this Court is reviewing the phrase in the context of developing property under MCL 211.7m as opposed to condemning property.

In this case, the city had no vacant industrial land within its limits; thus, the city acquired the land at issue and prepared it for development. The city improved and sold various parcels of the land, and these efforts at economic development and enhancing the tax base are indeed for a public purpose. While the land at issue was vacant during the time that the city owned it, the city improved the land by platting the property and beginning to install an infrastructure in 1991 to ready the land for sale. Among the items installed by the city were water lines, sanitary sewer lines, curbs, gutters, and roads. Also in 1991, the city began the completion or extension of at least three roads. A study conducted in the 1980s determined that a major street grid system was needed. The street widening and expansions resulted in better vehicle flow and provided a quicker response time for emergency vehicles. The city also noted in an amended resolution for annexation that efforts to develop roads for better traffic flow and safety were hampered by the city's lack of control over lands that were outside the city limits but necessary for the street extensions.

The land at issue also provided a location for much-needed housing. A housing study conducted on behalf of the city indicated that about 100 new residential low- and moderate-income units would be needed for city residents. The Mt. Pleasant Housing Commission purchased approximately 6.1 acres in 1991 for the development of low-income rental housing. In 1992, the city further platted two subdivisions containing about 4.6 acres. The land was also used for a 65-unit housing development for the elderly.

Moreover, the city's determination that it needed to expand its tax base with industrial development resulted in the city rejecting offers for the land that were not projected to create jobs or enhance the tax base. Subsequently, the land was used to create various projects, including five subdivisions, one condominium development, three apartment developments, soccer fields and a park, a county health department and emergency center, a state police post, an industrial park, a social security building, an optometrist's office, and at least one other commercial development.

Because we have determined that the city's efforts at economic development and enhancing the tax base were for "public purposes," we must next determine when the city "used" the land for these public purposes. The language chosen by the Legislature indicates that to be tax-exempt, the property must be "*used* for public purposes." MCL 211.7m (emphasis added). Thus, during each tax year in question, the city must have made a present use of the land that qualifies as a "public purpose" so that the city will have "used" the land for that

6

purpose. While this inquiry is, of course, fact-intensive, the court must consider what steps the city has taken to move from merely holding the land to actually using it for a public purpose.

In this case, the city conducted numerous activities that lead to the conclusion that the city "used" the land for a public purpose. The city engaged in a number of activities, such as expanding and installing streets and public utilities, to indicate that it purposefully moved toward implementation of its development plan for the land and did not delay in engaging in reasonable activities to prepare the land to attract economic development that would create jobs, stimulate investments, and ensure a sound and growing tax base. The reality of economic development is that acquiring and improving land for resale is not done in a day. It takes time to assemble and prepare land. Consequently, the city's ongoing actions in annexing, assembling, marketing, and preparing the land for resale to attract economic development indicate that the land was indeed "used for public purposes."

Today's decision that the city actively prepared and marketed the land at issue in accordance with its plan to foster economic development is in line with prior cases from this Court. In *Traverse City v East Bay Twp*, 190 Mich 327, 330; 157 NW 85 (1916), this Court held that vacant land owned by the plaintiff, Traverse City, was not tax-exempt. The plaintiff had purchased 960 acres of vacant land at the same time that it purchased operating power-plant facilities. Counsel for the plaintiff admitted at a hearing that the plaintiff had no plans for the

7

vacant land and that the land was not part of any plan with a broader vision. Counsel stated that the land was not being used and nothing had been done to develop it.

A city commissioner also testified that the land was undeveloped and that the plaintiff had not attempted to improve or change the natural condition of the land. The city commissioner stated that while the land *could* be used in the future to provide power, there was no plan to do so, and there was no time line when the land might be used. The city commissioner further stated that the current power plant was meeting the present needs and could meet a considerable increase in need. As this Court stated, "The lands not only are not used for any public purpose, but they are not used for *any* purpose." *Id.* at 330 (emphasis added). The land in *Traverse City* was being held for pure speculation—there was not even a vague plan regarding when or if the land would be used in the future.

In marked contrast, the city's plan for the property at issue in this case was not merely aspirational. In the resolution passed by the city to approve the property acquisition, the city stated that it wanted to acquire the land to handle the increased traffic demand caused by growth within the city and to use the land for the development of new industry that "is badly needed in the future to expand the City's tax base" because of the lack of other available land in the city. The city also had a conceptual site plan that divided the property into various zones to accommodate future uses under the master plan. The site plan provided a guide for areas of future development, such as roads, utilities, population densities,

8

residential neighborhoods, and commercial areas. The city solicited requests for proposals related to the land that were based on the conceptual site plan and land-use plan. The city did not delay in requesting these proposals, issuing a deadline of March 7, 1991. The city followed its plan for the land at issue and purposefully moved toward implementation of its plan by actively improving the land for resale. The city platted, developed, marketed, and eventually sold the land to encourage economic growth; thus, the city used the land for public purposes.

The city's use of the land for public purposes began when it started to prepare the land for economic development after the city purchased land adjacent to its borders and annexed this property to the city. In December 1990, the city reviewed the responses to its request for proposals for the recently purchased and annexed land, and the city also began developing a request for proposals for local real estate companies to market the property. Throughout 1991, the city actively engaged in planning for the land. For example, in January 1991, the city reviewed requests for proposals and discussed options for the sale of the land. Interviews that had taken place with two agencies that had submitted proposals for the land were discussed, as was a recommendation to list land with a cobroker to market the land. The city's land-marketing committee was also given specific authorization by the city to work with a development corporation to market and sell the land. In February 1991, the mayor discussed recommendations from the land-marketing committee with the city commission. Additionally, evaluations of the city's options were discussed, and members of the public spoke at a city

9

commission meeting about their concerns and opinions. In March 1991, proposals for the land were discussed and a resolution was passed regarding road expansion. In May 1991, a master plan for the residential portion of the land was discussed and a master plan for the newly acquired property was approved. In June 1991, the city continued to work on marketing and selling the land.

In July 1991, the city hired a management company to market approximately 220 acres of land. The city also hired a local nonprofit organization dedicated to attracting new industries to the area. The agreement between the city and the nonprofit organization provided that the organization was to develop a comprehensive master plan for the development of the proposed 138-acre industrial park and also develop, within 30 days of the signing of the agreement, a detailed marketing plan to be presented to the city. In 1991, the city also platted some of the land, and streets and public utilities were expanded and installed. The city also considered the master plan for the industrial part of the land.

Throughout 1992, the city continued platting and actively developing the property. The city considered and accepted offers for the land, as well as extended an agreement for surveying services to continue platting the land. The city also submitted a grant to the Economic Development Administration to assist with the cost of constructing necessary infrastructure improvements. When the grant was approved, roads and utilities were constructed in the industrial park area. Throughout 1993, 1994, and 1995, and subsequently when applicable, the city continued to market and sell the land.

The city's efforts with regard to the land indicate its active and purposeful engagement in using the land for the public purpose of economic development. The city's efforts to actively prepare the land for resale distinguish its actions from those of the plaintiff school district in *Rural Agricultural School Dist v Blondell*, 251 Mich 525, 526-527; 232 NW 377 (1930). In *Blondell*, the plaintiff acquired land with the intent to use the land for school purposes at some point in the future, but the plaintiff was renting dwellings on the land for private purposes. This Court held that the land was not tax-exempt because a future intended use of the property could not control the determination regarding its use for a public purpose when the *present* use of the land—renting it to private citizens just as any other landlord would do—was not for a public purpose. In contrast, in this case the city's present use was for a public purpose because the city actively and purposefully prepared the land for resale for the public purpose of economic development.

IV. CONCLUSION

The city of Mt. Pleasant acquired and actively prepared property for sale for economic development purposes and purposefully moved toward implementation of its plan for the land. As such, the property was being "used for public purposes" and is exempt from taxation under MCL 211.7m. Because the Michigan Tax Tribunal made an error of law when it concluded otherwise, we

11

reverse the judgment of the Court of Appeals and remand this case to the Tax Tribunal for entry of a judgment for the city.

Michael F. Cavanagh
Clifford W. Taylor
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman