*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COUNTY OF INGHAM, COUNTY OF JACKSON, and COUNTY OF CALHOUN,

　　　　Plaintiffs-Appellants,

v

MICHIGAN COUNTY ROAD COMMISSION SELF-INSURANCE POOL,

　　　　Defendant-Appellee.

FOR PUBLICATION
July 25, 2019
9:20 a.m.

No. 334077
Ingham Circuit Court
LC No. 15-000432-NZ

ON REMAND

Before: O'BRIEN, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

This case returns to this Court on remand from the Michigan Supreme Court. *Co of Ingham v Mich Co Rd Comm Self-Ins Pool*, 503 Mich 917 (2018) (*Co of Ingham II*). For the reasons explained in this opinion, we continue to hold that plaintiffs—Ingham County, Jackson County, and Calhoun County (collectively, the counties)—are entitled to refunds of their surplus premiums from prior-year contributions made by the counties' former road commissions to defendant, Michigan County Road Commission Self-Insurance Pool (the Pool).

## I. BACKGROUND

The facts of this case were outlined in this Court's previous opinion as follows:

　　A Declaration of Trust created the Pool in April 1984. The Pool's bylaws limit membership to county road commissions located in the state of Michigan and require each member to sign an inter-local agreement. The appointed road commissions for Ingham County, Jackson County, and Calhoun County joined the Pool soon after its formation.

　　Members of the Pool made annual premium contributions to cover the payment of claims and the Pool's operating and administrative expenses. The

-1-

Pool's bylaws and the inter-local agreements permitted the refund of surplus funds more than one year after payment of a member's premium contribution. The counties alleged that the Pool had a longstanding practice of refunding excess contributions to members out of unused reserves in proportion to premiums paid, typically calculated and refunded several years later.

In February 2012, the Legislature amended MCL 224.6 to permit transfer of "the powers, duties, and functions that are otherwise provided by law for an appointed board of county road commissioners . . . to the county board of commissioners by resolution as allowed under . . . MCL 46.11." MCL 224.6(7), as amended by 2012 PA 14. At the same time, the Legislature amended MCL 46.11 to give a county board of commissioners the authority to pass a resolution dissolving an appointed road commission and transferring the road commission's "powers, duties, and functions" to the county board of commissioners. MCL 46.11(s), as amended by 2012 PA 15. Pursuant to these amendments, the Ingham County, Jackson County, and Calhoun County Boards of Commissioners adopted resolutions to dissolve their county road commissions and take over their roles.

Ingham County adopted the dissolution resolution on April 24, 2012, effective June 1, 2012. About two weeks before adopting the resolution, Ingham County paid its contribution to the Pool for the fiscal year beginning April 1, 2012, apparently with the understanding that the Pool intended to amend its rules to permit the county successors to the dissolved road commissions to participate in the Pool. Ingham County maintained that it only learned later in May that the Pool would not allow the county to remain a member of the Pool. On May 30 and 31, 2012, the Ingham County road commission signed two agreements—one to withdraw from the Pool and one to cancel insurance through the Pool—effective June 1, 2012.

Calhoun County signed a similar withdrawal agreement on October 23, 2012, effective November 1, 2012. It appears that Jackson County did not sign a withdrawal agreement.

At Ingham County's request, the Pool agreed to refund the unused pro rata portion of the former road commission's annual contribution for the 2012–2013 fiscal year. The Pool declined, however, to refund surplus equity flowing from prior-year contributions because of the road commission's withdrawal from membership in the Pool. [*Co of Ingham v Mich Co Rd Comm Self-Ins Pool*, 321 Mich App 574, 577-578; 909 NW2d 533 (2017) (*Co of Ingham I*).]

The counties brought suit against the Pool, alleging that they were eligible for 10 years' worth of refunds because the Pool was still refunding contributions from 2002 premiums. The parties filed cross-motions for summary disposition, and the trial court granted summary disposition to the Pool and rejected the counties' claims. The trial court reasoned that the counties were not entitled to refunds possibly owed to their former road commissions because the counties were not successors in interest to their former road commissions.

On appeal, this Court disagreed and held that the counties were successors in interest to their former road commissions. *Id*. at 580-584. This Court then addressed "whether the counties could be members of the Pool and thereby be eligible for surplus refunds of prior-year contributions," and concluded "that the successor counties are eligible for Pool membership . . . ." *Id*. at 584.

This Court lastly addressed whether the counties were entitled to refunds because, even though they were successors in interest, they withdrew from the Pool. *Id*. The Court first acknowledged that Jackson County was situated differently from the other counties because it did not sign a withdrawal agreement with the Pool. *Id*. at 585. This Court concluded that without a withdrawal agreement, Jackson County "did not withdraw from the Pool." *Id*. This Court also concluded that Jackson County's "dissolution of its road commission did not automatically result in withdrawal from the Pool." *Id*. This Court then held that, because Jackson County (1) did not withdraw from the Pool and (2) "succeeded its dissolved road commission," it was "eligible for refunds from prior-year contributions made by its road commission." *Id*.

Turning to the other counties that *did* sign withdrawal agreements with the Pool, this Court looked to the language of the withdrawal agreements to determine their scopes. After reviewing the agreements' relevant language, this Court concluded:

> Accordingly, reading the withdrawal agreements as a whole and in light of the limitation on their scope, the withdrawal agreements did not alter eligibility for the refund of surplus premiums from prior-year contributions. Having determined that the counties are successors in interest to their former road commissions, we conclude that the counties are entitled to refunds of surplus premiums reflecting their former road commissions' prior-year contributions through the date listed in each withdrawal agreement. [*Id*.]

The Pool appealed this Court's decision, and our Supreme Court issued the following order:

> Pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we REMAND this case to the Court of Appeals for consideration of the issue raised by the defendant but not addressed by that court during its initial review of this case: Whether, even if the plaintiff counties are successors in interest to their road commissions, the defendant Michigan County Road Commission Self-Insurance Pool nevertheless may, in accordance with its governing documents, decline to issue to the counties refunds of surplus premiums from prior-year contributions. In addressing this question, the Court of Appeals shall consider, among other things, the following documents: the Declaration of Trust, By-Laws, Inter-Local Agreements, MCRCSIP Refund Overview, and the July 19, 1990 memorandum to the Pool members. The court shall address whether these documents are binding on the parties, and, if so, what effect they have on the plaintiffs' entitlement to refunds. [*Co of Ingham II,* 503 Mich at 917.]

-3-

## II. STANDARD OF REVIEW

A trial court's decision on summary disposition is reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009). Because the trial court considered evidence outside the pleadings, we treat the trial court's grant of summary disposition as having been under MCR 2.116(C)(10). See *Sisk-Rathburn v Farm Bureau Gen Ins Co of Mich*, 279 Mich App 425, 427; 760 NW2d 878 (2008).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted).

## III. ANALYSIS

On remand, we are tasked with deciding a single question: "Whether, even if the plaintiff counties are successors in interest to their road commissions, [the Pool] nevertheless may, in accordance with its governing documents, decline to issue to the counties refunds of surplus premiums from prior-year contributions." *Co of Ingham II*, 503 Mich at 917. While this directive is relatively straightforward, the parties argue over to what extent, if any, this Court can disregard its earlier opinion. We address this dispute before turning to our task on remand.

### A. LAW-OF-THE-CASE DOCTRINE

As explained by this Court,

> Under the doctrine of the law of the case, if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal question will not be differently determined in a subsequent appeal in the same case where the facts remain materially the same. The primary purpose of the law-of-the-case doctrine is to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. [*Bennett v Bennett*, 197 Mich App 497, 499-500; 496 NW2d 353 (1992) (citation omitted).]

The Pool contends that we are not bound by the law-of-the-case doctrine because that doctrine is discretionary. The Pool is correct that courts have some discretion when applying the law-of-the-case doctrine under certain circumstances. See, e.g., *Locricchio v Evening News*

*Ass'n*, 438 Mich 84, 109-110; 476 NW2d 112 (1991) (explaining that there are instances where "the law of the case doctrine must yield to a competing doctrine"); *People v Spinks*, 206 Mich App 488, 491; 522 NW2d 875 (1994) (refusing to apply the law-of-the-case doctrine because there had been an intervening change in the law); *People v Phillips*, 227 Mich App 28, 34; 575 NW2d 784 (1997) ("[W]e decline to apply a doctrine designed for judicial convenience in fairly administering the obligation to do justice so as to work an injustice."). Yet the Pool's only argument for not applying the law-of-the-case doctrine is that, according to the Pool, our previous decision was wrong. As this Court has explained, such a reason is not sufficient to justify ignoring the law-of-the-case doctrine:

> [W]e do not believe that a conclusion that the prior decision was erroneous is sufficient by itself to justify ignoring the law-of-the-case doctrine. To do so would vitiate that doctrine because it would allow this Court to ignore a prior decision in a case merely because one panel concluded that the earlier panel had wrongly decided the matter. It would, therefore, reopen every case to relitigation of every issue previously decided in hopes that a subsequent panel of the Court would decide the issue differently than did the prior panel. Clearly, the law-of-the-case doctrine has no usefulness if it is only applied when a panel of this Court agrees with the decision reached by a prior panel. [*Bennett*, 197 Mich App at 500.]

We therefore conclude that, to the extent that our Supreme Court's remand order left intact this Court's earlier legal conclusions, we are bound by those conclusions under the doctrine of the law of the case. This includes this Court's previous holdings that the counties are successors in interest to their former road commissions and that Jackson County did not withdraw from the Pool.

### B. DOCUMENTS TO CONSIDER ON REMAND

Our Supreme Court directed us to consider, among other things, five documents on remand: the Declaration of Trust, By-Laws, Inter-Local Agreements, MCRCSIP Refund Overview, and the July 19, 1990 memorandum to the Pool members. *Co of Ingham II*, 503 Mich at 917.

### 1. DECLARATION OF TRUST

The Declaration of Trust created the Pool in 1984. As relevant here, the Declaration of Trust provides:

<u>ARTICLE VI</u>

<u>POWERS AND DUTIES OF THE BOARD OF DIRECTORS</u>

\* \* \*

SECTION 9. <u>Use of Funds</u>. The Board of Directors shall set aside from the premiums collected during each fiscal year a reasonable sum for the operating expenses or administrative expenses of the Trust for that year. All remaining

funds coming into its possession or under its control with respect to that fiscal year of the Trust shall be set aside and shall be used only for the following purposes:

\* \* \*

(f)   Distribution among the members during that fiscal year in such manner as the Members and the Board of Directors shall deem to be equitable, of any excess monies remaining after payment of claims and claims expenses and after provision has been made for open claims and outstanding reserves and a reserve for claims incurred but not reported; provided, however, that no such distributions shall be made earlier than twelve (12) months after the end of each Trust Year; and provided further, that undistributed funds from previous Trust Years may be distributed at any time if not required for loss funding and if approved for distribution by the Board of Directors. *The Board of Directors may treat members who withdraw from future Trust Years differently and less favorably than they treat members who continue in the Trust for future years.*

\* \* \*

ARTICLE X

MISCELLANEOUS

\* \* \*

SECTION 12.  Binding Effect.  This Trust shall be binding upon and be fully enforceable as to each Member *and the successors and assigns of each Member*.  [Emphasis added.]

2. INTER-LOCAL AGREEMENT

All parties that became members of the Pool signed an "Inter-Local Agreement" pursuant to 1982 PA 138 (the intergovernmental contracts act, MCL 124.1 *et seq.*), under which certain governmental bodies are permitted to, among other things, "form a group self-insurance pool." See *Crawford Co v Secretary of State*, 160 Mich App 88, 91; 408 NW2d 112 (1987).  These inter-local agreements provided, in relevant part:

This Contract and Inter-Local Agreement is entered into by and between [the Pool] and the undersigned road commission of the State of Michigan (hereinafter "Member") for the purpose of making a self-insurance pooling program available . . . pursuant to Act 138 of 1982 [the intergovernmental contracts act].

\* \* \*

3.   Member Contributions to Pool. . . .   The Pool shall set aside from the premiums collected during each fiscal year a reasonable sum for the operating

-6-

expenses or administrative expenses of the Pool for that year. All remaining funds coming into the possession of the Pool with respect to that fiscal year of the Pool shall be set aside and shall be used only for the following purposes:

\* \* \*

H. Distribution among the members during that fiscal year in such manner as the Pool shall deem to be equitable, of any excess monies remaining after payment of claims and claims expenses and after provision has been made for open claims and outstanding reserves and a reserve for claims incurred but not reported; provided, however, that no such distribution shall be made than [sic] earlier than twelve (12) months after the end of each Pool Year; and provided, further, that undistributed excess funds from previous Pool Years may be distributed at any time if not required for loss funding and if approved for distribution by applicable Boards and authorities. *The Pool may treat members who withdraw from future Pool Years differently and less favorably than the Pool treats members who continue in the Pool for future years.*

\* \* \*

24. <u>Binding Effect</u>. This Agreement is binding upon *the parties hereto, their successors and assigns*. [Emphasis added.]

### 3. BY-LAWS

The Pool's By-Laws provide, in relevant part:

### ARTICLE VI

### POWERS AND DUTIES OF THE BOARD

\* \* \*

13. The Pool Board shall have the general power to make and enter into all contracts, leases, and agreements necessary or convenient to carry out any of the powers granted under the Trust Agreement, these By-laws or any other laws. All such contracts, leases, and agreements, or other legal documents herein authorized shall be approved by resolution of the Pool Board and shall be executed by those individuals designated in such resolution. In the absence of such a designation, all approved contracts shall be executed by the Chairperson or Vice Chairperson.

14. The Pool Board shall carry out all the duties necessary for the proper operation and administration of the Pool on behalf of the Members and to that end shall have all of the power necessary and desirable for the effective administration of the affairs of the Pool.

## ARTICLE VII

## ADMINISTRATION

There shall be an Administrator of the Pool (herein referred to as the "Administrator") to administer the financial and administrative affairs of the Pool. The Administrator shall be an employee of the Pool and shall be appointed by, and serve at the pleasure of the Pool Board. The Administrator shall have the power and authority to implement policy matters set forth by the Pool Board as they relate to the ongoing operation and supervision of the Pool and the provisions of the Trust Agreement establishing the Pool, the By-laws, the Inter-Local Agreement, applicable Federal and/or State statutes, and other applicable governmental rules and regulations.

\* \* \*

## ARTICLE X

## DETERMINATION OF CONTRIBUTIONS BY MEMBERS OR REFUNDS TO MEMBERS

The Pool Board shall determine the amount of contribution to be paid annually by each Member. Such contribution shall be calculated based on past experience, projected future losses, excess and stop loss insurance costs, administrative costs, loss prevention costs, and any other projected expenses to be incurred in the operation and administration of the Pool. Should deficiencies or surpluses occur within the funding of the Pool, the Pool Board shall determine the method of addressing these deficiencies or surpluses through the annual contribution mechanism . . . .

\* \* \*

## ARTICLE XII

## WITHDRAWAL OR TERMINATION OF MEMBERSHIP

Any Member may withdraw from the Pool by giving at least sixty days written notice to the Pool Board of its desire to so withdraw. The Pool Board shall develop procedures for addressing accumulated equity, if any, or accumulated funding deficiency. The Pool Board shall determine the short rate cancellation penalty for terminating prior to the annual renewal date.

4. MCRCSIP REFUND OVERVIEW, AND THE JULY 19, 1990 MEMORANDUM

The other two documents that this Court is to consider on remand were both evidently drafted by the Pool's agents in 1990. The first is a correspondence from the Pool's administrator dated July 19, 1990 (the 1990 correspondence), informing the Pool's members that the Pool had adopted a new "policy" for the eligibility of withdrawing members to receive excess-contribution

refunds. In relevant part, the 1990 correspondence states: "A withdrawing member forfeits any and all rights to dividend, credits, and/or accumulated interest that is to be paid or shall become payable after the effective date of the member's withdrawal from the Pool."

The other document is a "Refund Overview" (the refund overview), which the Pool says was disseminated to all of its members in 1990.[1] The document is unsigned and undated. It provides a detailed explanation of the steps that the Pool's Board of Directors use "to determine the proper allocation of the distribution to the members[.]"

With the content of these documents in mind, we must now decide whether these documents "are binding on the parties, and, if so, what effect they have on the plaintiffs' entitlement to refunds." *Ingham Co II*, 503 Mich at 917.

## C. PRINCIPLES OF CONTRACT INTERPRETATION

As discussed in *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016):

> Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement. When interpreting a contract, our primary obligation is to give effect to the parties' intention at the time they entered into the contract. To do so, we examine the language of the contract according to its plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written[.] [Quotation marks and citations omitted.]

If a contract does not define a word or phrase used in the contract, it is proper to consult a dictionary "to ascertain the plain and ordinary meaning of" the word or phrase. *Auto Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015). "[C]ontracts must be read as a whole," *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 447; 886 NW2d 445 (2015), giving "effect to every word, phrase, and clause," while taking pains to "avoid an interpretation that would render any part of the contract surplusage or nugatory," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

## D. WHAT COMPRISES THE PARTIES' AGREEMENT?

We must now determine which of the documents listed by our Supreme Court—the Declaration of Trust, the by-laws, the inter-local agreements, the refund overview, and the 1990 correspondence—are binding on the parties. We conclude that, with the exception of the refund overview, all of the documents form part of the parties' agreement.

---

[1] Aside from a copy of the refund overview, the Pool has presented no evidence that the document was ever provided to plaintiffs—or their former road commissions—in 1990 or any time thereafter.

County road commissions are bodies corporate, and "[l]ike a municipal corporation, [a] road commission's existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it." *Oakland Co Bd of Co Rd Comms v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 609; 575 NW2d 751 (1998). As our Supreme Court recognized in *Wayne Co v Hathcock*, 471 Mich 445, 460; 684 NW2d 765 (2004), "Art 7, § 1 of our 1963 Constitution provides that '[e]ach organized county shall be a body corporate with powers and immunities provided by law,'" and legal powers conferred to the counties must be broadly construed in their favor. (Alteration in *Hathcock*.)

Self-insurance pools like the one at issue here are statutorily authorized under the intergovernmental contracts act and may be formed by two or more "municipal corporations." MCL 124.5; *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 211 n 5; 702 NW2d 106 (2005) (opinion of YOUNG, J.).[2] To form such a pool, the contracting municipal corporations must enter into an "intergovernmental contract" that contains certain provisions. MCL 124.5; MCL 124.7. MCL 124.5 provides:

> (1) Notwithstanding any other provision of law to the contrary, any 2 or more municipal corporations, by intergovernmental contract, may form a group self-insurance pool to provide for joint or cooperative action relative to their financial and administrative resources for the purpose of providing to the participating municipal corporations risk management and coverage for pool members and employees of pool members, for acts or omissions arising out of the scope of their employment . . . .

> \* \* \*

> (5) In addition to any other powers granted by this act, the power to enter into intergovernmental contracts under this section specifically includes the power to establish the pool as a separate legal or administrative entity for purposes of effectuating group self-insurance pool agreements.

> \* \* \*

> (7) Two or more municipal corporations shall not form a group self-insurance pool to provide the coverages described in subsection (1) other than pursuant to sections 5 to 12b.

Section 7 of the act, MCL 124.7, further provides:

> Any intergovernmental contract entered into under section 5 for the purpose of establishing a group self-insurance pool shall provide:

---

[2] For purposes of the act, the term "municipal corporation" is statutorily defined to include "a county, charter county, county road commission, . . . or any other local governmental authority or local agency with power to enter into contractual undertakings." MCL 124.1(a).

(a) A financial plan . . . .

* * *

(b) A plan of management which provides for all of the following:

(*i*) The means of establishing the governing authority of the pool.

(*ii*) The responsibility of the governing authority with regard to fixing contributions to the pool, maintaining reserves, levying and collecting assessments for deficiencies, disposing of surpluses, and administering the pool in the event of termination or insolvency.

(*iii*) The basis upon which new members may be admitted to, and existing members may leave, the pool.

(*iv*) The identification of funds and reserves by exposure areas.

(*v*) Other provisions necessary or desirable for the operation of the pool.

(c) For election by pool members of a governing authority, which shall be a board of directors for the pool, a majority of whom shall be elected or appointed officers of pool members.

Here, the Declaration of Trust formed the *Pool*—meaning the trust vessel that would hold the members' pooled self-insurance reserves—but the Declaration of Trust is seemingly not the "intergovernmental contract" between the members. Rather, the intergovernmental contract seems to be comprised of the inter-local agreements that were signed by each of the Pool's municipal members, as evidenced by the fact that the preambles of those agreements explicitly reference the intergovernmental contracts act.

The inter-local agreements, however, reference the Declaration of Trust and the by-laws; the agreements state that the members agree "to participate in the formation and/or operation of [the Pool]," and that the "Pool shall be a separate legal entity consisting of a Trust Agreement . . . and such By-Laws, rules and regulations as are from time to time adopted pursuant to the Trust." The inter-local agreements go on to specify that "[t]he responsibility of the Pool with regard to . . . disposing of surpluses . . . shall be as set forth in the Trust creating the Pool, the Pool By-Laws, rules, regulations, coverage agreements and Inter-Local Agreements entered into between the Pool and participating county road commissions."

"[W]here one writing refers to another, the two writings are to be construed together, including any modifications agreed to by the parties in *subsequent* writings[.]" *Smith Living Trust v Erickson Retirement Communities*, 326 Mich App 366, 387; 928 NW2d 227 (2018) (quotation marks and citations omitted). None of the documents at issue here contain merger or integration clauses. We therefore conclude that a proper construction of the parties' "agreement" must take into consideration the inter-local agreements and all writings referred to in them, including the Declaration of Trust, the by-laws, and any "rules or regulations" that were later adopted pursuant to the trust agreement.

This raises the question of what "rules or regulations" must be considered binding on the parties under their agreement. We conclude that the refund overview does not qualify as such a rule or regulation, at least for purposes of summary disposition under MCR 2.116(C)(10). The refund overview is neither dated nor signed, and the Pool has presented no substantively admissible evidence indicating that the refund overview was ever approved by the Pool's board or membership, or otherwise properly promulgated pursuant to the Declaration of Trust or the by-laws. Therefore, the refund overview is not properly considered as part of the parties' agreement.

We reach the opposite conclusion for the refund policy that the Pool announced in the 1990 correspondence. Appended to the 1990 correspondence is a May 2012 email from the Pool's administrator, Gayle Pratt, in which she states that the policy summarized in the 1990 correspondence was adopted by the Pool's board. Assuming that Pratt's email would not be admissible at trial to prove the truth of its assertions, its contents are *substantively* admissible for purposes of summary disposition because Pratt could be called to testify about those assertions at trial. See MCR 2.116(G)(6) ("Affidavits, depositions, admissions, and documentary evidence offered in support of or in opposition to a motion based on subrule (C)(1)-(7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion."); *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). We therefore consider the policy set forth in the 1990 correspondence to be part of the parties' agreement.

Having determined that the parties' agreement includes the Declaration of Trust, the by-laws, the inter-local agreements, and the 1990 correspondence, we now reach the central question asked of us on remand: whether the Pool can, "in accordance with its governing documents, decline to issue to the counties refunds of surplus premiums from prior-year contributions." *Ingham Co II*, 503 Mich at 917.

## D. JACKSON COUNTY

As noted in *Ingham Co I*, Jackson County is situated differently than the other two counties because it did not sign a withdrawal agreement. Relevant to the issue on remand, this Court in *Ingham Co I* held:

> [T]he record contains no evidence that the Jackson County road commission signed a withdrawal agreement, and the Pool agrees that it did not. Thus, the Jackson County road commission did not withdraw from the Pool. Likewise, Jackson County's dissolution of its road commission did not automatically result in withdrawal from the Pool. Rather, Jackson County succeeded its dissolved road commission, so Jackson County is eligible for refunds from prior-year contributions made by its road commission. [*Ingham Co I*, 321 Mich App at 585.]

The Pool argues that Jackson County is not entitled to a refund based on (1) the language from the inter-local agreements and Declaration of Trust allowing the Pool to "treat members who withdraw from future Pool Years differently and less favorably than the Pool treats members who continue in the Pool for future years," and (2) the policy announced in the 1990

correspondence (which we will refer to as "the withdrawal policy") that "[a] withdrawing member forfeits any and all rights to dividend, credits, and/or accumulated interest that is to be paid or shall become payable after the effective date of the member's withdrawal from the Pool." We disagree.

Because this Court previously concluded that Jackson did not withdraw from the Pool, and because our Supreme Court's remand order in no way disturbed this holding, we are bound by the law-of-the-case doctrine to conclude that Jackson Count did not withdraw from the Pool. And because Jackson County did not withdraw from the Pool, the provision that the Pool relies on to deny Jackson County refunds from prior-year contributions—that the Pool can treat members *who withdraw* from future Pool Years differently—is inapplicable. We therefore continue to hold that because Jackson County did not withdraw from the pool and is the successor in interest to its former road commission, Jackson County is entitled to refunds from prior-year contributions.

## E. OTHER COUNTIES

Unlike Jackson County, Ingham County and Calhoun Count signed withdrawal agreements. And the withdrawal policy is clear—"[a] withdrawing member forfeits any and all *rights to dividend, credits, and/or accumulated interest* that is to be paid or shall become payable after the effective date of the member's withdrawal from the Pool." (Emphasis added.) In the insurance context, the term "dividend" is defined as "a share of surplus allocated to a policyholder in a participating insurance policy[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, the refunds that the counties seek—refunds of surplus self-insurance premiums—fall within the meaning that should be ascribed to the term "dividend" in the withdrawal policy.

The question then becomes whether the withdrawal policy is enforceable. Absent ambiguity, a contract must generally be enforced as written. *Innovation Ventures*, 499 Mich at 507. "However, contracts founded on acts prohibited by a statute, or contracts in violation of public policy, are void." *Allard v Allard*, 318 Mich App 583; 899 NW2d 420 (2017). See also *Krause v Boraks*, 341 Mich 149, 155; 67 NW2d 202 (1954) (explaining that "neither law nor equity will enforce a contract made in violation of . . . a statute or one that is in violation of public policy") (quotation marks and citation omitted).

The counties argue that the withdrawal policy is unenforceable as a violation of public policy. "In ascertaining the parameters of our public policy, we must look to policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Rory v Continental Ins Co*, 473 Mich 457, 471; 703 NW2d 23 (2005). See also *Terrien v Zwit*, 467 Mich 56, 66; 648 NW2d 602 (2002) ("In defining 'public policy,' it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy *is*, and not to simply assert what such policy *ought* to be on the basis of the subjective views of individual judges.").

As noted earlier, the parties' agreement in this case is governed by the intergovernmental contracts act. In that act, the Legislature explicitly enumerated the public policy interests that are at stake, providing in MCL 124.5(6):

> The legislature hereby finds and determines that insurance protection is essential to the proper functioning of municipal corporations; that the resources of municipal corporations are burdened by the securing of insurance protection through standards carriers; that proper risk management requires spreading risk to minimize fluctuation in insurance needs; and that, therefore, all contributions of financial and administrative resources made by a municipal corporation pursuant to an intergovernmental contract authorized under this act are made for a public and governmental purpose, and that those contributions benefit each contributing municipal corporation.

In light of MCL 124.5(6) and the statutory enactments discussed in *Ingham Co I*, 321 Mich App at 577, we hold that the withdrawal policy is unenforceable under these circumstances as contrary to public policy. See *Allard*, 318 Mich App at 601 ("Although parties have a fundamental right to contract as they see fit, they have no right to do so in direct contravention of this state's laws and public policy."). As MCL 124.5(6) makes clear, the Legislature intended governmental self-insurance pools to serve as a force that would *spread*—not concentrate—risk between municipal members, and to *minimize*—not accentuate—fluctuations. As recognized in *Ingham Co I*, 321 Mich App at 581-582, "when a county dissolves its road commission, the county board of commissioners becomes the successor in interest to the former road commission," and "the powers, duties, and functions of the dissolved county road commission[] pass[] to the [county's] boards of commissioners." In other words, in such situations, the county is more than merely its road commission's "successor in interest"; the county is effectively a continuation of the dissolved road commission, responsible for providing the same public services that were formerly provided by the road commission.

To permit the Pool to enforce the withdrawal policy against the counties would be to permit the Pool to penalize the counties for exercising their rights to dissolve their road commissions under MCL 46.11(s) and MCL 224.6(7). More importantly, the forfeiture called for in the withdrawal policy would directly undermine the public purposes that the Pool is required to serve under MCL 124.5(6), affording the remaining members of the Pool a comparatively small windfall (in the form of each one's pro rata share of the excess equity payments made by the counties' former road commissions), while imposing a large, unexpected forfeiture on the three withdrawing counties. This scenario undercuts the basic principles of predictability and stability that the Legislature intended such self-insurance pools to promote.

We find further support for our conclusion that our state's public policy disfavors self-insurers conditioning refunds of surplus insurance premiums on continued participation in the self-insurance pool in the Uniform Trade Practices Act, MCL 500.2001 *et seq*. MCL 500.2016 provides:

> (1) In addition to other provisions of law, the following practices as applied to worker's compensation insurance including worker's compensation coverage provided through a self-insurer's group are defined as unfair methods of

-14-

competition and unfair and deceptive acts or practices in the business of insurance:

> (a) As a condition of receiving a dividend for the current or a previous year, requiring an insured to renew or maintain worker's compensation insurance with the insurer beyond the current policy's expiration date or requiring a member to continue participation with a worker's compensation self-insurer group.

While this statute, by its terms, only applies to workers' compensation insurance, we find it telling that our Legislature classified this type of act as "unfair and deceptive . . . practices in the business of insurance." Based on our Legislature's clear condemnation of the Pool's practice—albeit in the context of workers' compensation insurance—combined with the public policy interests defined in MCL 124.5(6), we conclude that the Pool's withdrawal policy is unenforceable as against public policy.[3]

## F. REMEDY

The next question is what remedy should be applied: do the offending provisions of the parties' agreement render the entire agreement voidable or void *ab initio*? See generally *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 536-539; 872 NW2d 412 (2015) (observing that a contract that is void *ab initio* is a nullity at the outset and, thus, is unenforceable by any party, whereas a voidable contract is one that may be rescinded or avoided at the option of a specific party). "The difficulty . . . is that courts have been known to be imprecise with their use of the term 'void,' and have on occasion mistakenly employed that term to describe a contract when what is actually meant is that a contract is voidable or otherwise unenforceable, and not that it is void *ab initio*." *Id*. at 543-544.

Like contractual terms, it has long been recognized that contractual *remedies* are subject to the demands of public policy. See, e.g., *Meech v Lee*, 82 Mich 274, 293; 46 NW 383 (1890) ("[E]ven where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him."); *Bazzi v Sentinel Ins Co*, 502 Mich 390, 415; 919 NW2d 20 (2018) (McCORMACK, J., dissenting) ("Contract remedies like rescission play by those same rules: they cannot be exercised in a manner contrary to law or public policy."). Thus, when deciding whether a contract drafted in contravention of a statute is void *ab initio* or merely subject to avoidance by a specific party, a reviewing court should resolve the issue by deciding what would best serve the statute's underlying legislative intent. *Epps*, 498 Mich at 546 ("[W]ith that overarching purpose in mind, we inquire whether this

---

[3] For similar reasons that the Pool's withdrawal policy is unenforceable as against public policy, we conclude that the Pool's proposed construction of the "differently and less favorably" language in the inter-local agreements and Declaration of Trust would render *those* provisions contrary to public policy. If, as the Pool contends, that language should be interpreted as permitting what the withdrawal policy required, it would contravene the public policy set forth by our Legislature in MCL 124.5(6).

purpose would be better served by treating contracts between an innocent homeowner and an unlicensed builder as void or voidable.").

Holding that the parties' entire agreement here is void *ab initio*, and thus unenforceable by any party, would do *greater* damage to the policies set forth in MCL 124.5(6), effectively upending the entire Pool. That outcome can be avoided by applying the doctrine of severability. An unlawful term in a contract is severable from the whole unless that term is "central to the parties' agreement." *Stokes v Millen Roofing Co*, 466 Mich 660, 666; 649 NW2d 371 (2002). Hence, "[t]he failure of a distinct part of a contract does not void valid, severable provisions." *Prof Rehab Assoc v State Farm Mut Auto Ins Co*, 228 Mich App 167, 174; 577 NW2d 909 (1998). In determining severability, the "primary consideration . . . is the intent of the parties." *Id*.

As noted, the Declaration of Trust was incorporated by reference into the intergovernmental contract. Article X, § 11 of the Declaration of Trust provides:

> Severability. Should any provision of this Trust be or become invalid or unenforceable, the remaining provisions shall continue to be fully effective.

Thus, it seems that the parties intended for the terms of their agreement to be severable. Additionally, the withdrawal policy that the Pool seeks to enforce in this action is in no way "central" to the parties' agreement. It is undisputed that the withdrawal policy was first set forth by the Pool's board in 1990—years after the Pool was originally formed. We therefore conclude that the offending portions of the parties' agreement are severed as unenforceable. This, in our opinion, is the best remedy to effectuate the legislative policies announced in MCL 124.5(6). And because the withdrawal-policy portions of the parties' agreement are severed, the counties, as successors in interest to their former road commissions, are all entitled—under Article X, § 12 of the Declaration of Trust[4]—to the portion of future refunds of surplus equity to which their respective former road commissions would have been entitled.

## H. CONCLUSION

The Pool's withdrawal policy does not apply to Jackson County because Jackson County did not withdraw from the Pool. Regardless, the withdrawal policy is unenforceable against any of the counties because it is contrary to public policy. We therefore hold that the trial court erred when it held that the Pool was entitled to judgment as a matter of law.

---

[4] Article X, § 12 of the Declaration of Trust provides: "This Trust shall be binding upon and be fully enforceable as to each Member *and the successors and assigns of each Member*." (Emphasis added.)

Reversed and remanded.  We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens